UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
OPPENHEIMER & CO. INC.,                      :
                                             :   Civil Action No. 1:23-CV-04909
                          Plaintiff,         :
                                             :
        - against -                          :
                                             :
HUB CYBER SECURITY (ISRAEL) LTD. a/k/a       :
HUB CYBER SECURITY LTD.,                     :
                                             :
                          Defendant.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
```

## <u>LETTER OF REQUEST</u>

TO THE HONORABLE TZACHI UZIEL, DIRECTOR OF THE COURTS, 22 KANAFI HANESHARIM STREET, JERUSALEM, 9546436:

The United States District Court for the Southern District of New York presents its compliments to the Director of the Courts and requests international judicial assistance in ordering and obtaining documents and oral testimony from non-party witness A-Labs Advisory & Finance Ltd.

This Court requests the assistance described herein pursuant to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, as adopted and implemented in the United States of America at 28 U.S.C. § 1781. THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK is a competent court of law and equity which properly has jurisdiction over this proceeding and has the power to compel the attendance of witnesses both within and outside its jurisdiction. A-Labs Advisory & Finance Ltd. will have documents knowledge of the topics set forth in Schedules A and B annexed hereto.

The testimony is intended for use in the above-captioned matter, and in the view of this Court will be highly relevant to the claims and defenses. This request is made with the understanding that it will in no way require any persons to commit any offense, or to undergo a broader form of inquiry than they would if the litigation were conducted in Israel. In the proper exercise of its authority, this Court has determined that the information cannot be secured except by intervention of the Director of the Courts.

I.    **SENDER:**

> The Honorable John P. Cronan
> United States District Court
> Southern District of New York
> Daniel Patrick Moynihan
> United States Courthouse
> 500 Pearl St.
> New York, NY 10007-1312

II.    **THE PARTIES TO THE PROCEEDINGS:**

Plaintiff: Oppenheimer & Co. Inc. ("Oppenheimer")

Counsel for Plaintiff:  Walter A. Saurack
> Michael H. Gibson
> Nelson Stewart
> Duane Morris LLP
> 230 Park Avenue, Suite 1130
> New York, N.Y. 10169
> 212-818-9200

Defendant: HUB Cyber Security (Israel) Ltd., a/k/a HUB Cyber Security Ltd. ("HUB")

Counsel for Defendant: Ari M. Berman
> Eugenie Dubin
> Pillsbury Winthrop Shaw Pittman, LLP
> 31 West 52nd Street
> New York, N.Y. 10019-6131
> 212-858-1268

III.    **NATURE OF THE PROCEEDINGS**

Oppenheimer filed a complaint against HUB on June 12, 2023 alleging that it is owed in excess of $12,000,000 in fees and expenses for investment banking services provided to HUB pursuant to the terms of a December 24, 2021 written agreement (the "Agreement"). The Agreement provided that HUB would pay Oppenheimer a fee equal to 1% of the "Transaction Value" as of the closing date of any sale, merger or other business combination ("Transaction") governed by the Agreement.

On March 23, 2022, HUB announced that it had entered into an agreement with non-party Mount Rainier Acquisition Corp. ("Mount Rainier").  The Transaction qualified as a "Transaction" under the terms of the Agreement.  Press releases and SEC filings issued by HUB valued the Transaction at approximately $1.28 billion. Several days prior to the closing of the Transaction, HUB sought to negotiate the fee arrangement of the Agreement. Though the Agreement did not provide for a revision of the fee arrangement, Oppenheimer agreed to HUB's request to amend the fee in a February 27, 2023 written agreement (the "Amended Agreement"). The Amended Agreement specifically provided that HUB would pay Oppenheimer in four installments.  In the event that HUB failed to pay any of the four installments, Oppenheimer retained its right to seek payment of the full transaction fee and out-of-pocket expenses.

To date, HUB has not paid any portion of the fee that Oppenheimer is entitled to under the Agreement or the Amended Agreement. The Complaint brings claims against HUB for Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing and *Quantum Meruit*. A copy of the Complaint is annexed hereto as Exhibit A.

HUB filed an Answer to the Complaint on September 22, 2023 asserting certain affirmative defenses and denying that Oppenheimer is entitled to the fees claimed in connection with the Transaction. The Answer admits that HUB and Oppenheimer entered into the

Agreement and Amended Agreement but denies that Oppenheimer performed its obligations under the Agreement. The Answer further alleges that Oppenheimer cannot demonstrate that it is owed the fees it seeks pursuant to the Agreement. A copy of the Answer is annexed hereto as Exhibit B.

HUB has identified A-Labs Advisory & Finance Ltd., 18 Duvdevan, Kadima, Israel 6092000, +972 58-778-7750 and Doron Cohen, c/o A-Labs Advisory & Finance Ltd., 18 Duvdevan, Kadima, Israel 6092000, +972 58-778-7750, as non-parties in possession of information relevant to HUB's allegations that (i) Oppenheimer did not perform its obligations under the Agreement; and (ii) Oppenheimer cannot demonstrate that the reasonable value of its services is equivalent to the fees it seeks in the Complaint.

In order to fully discover the disputed facts in this action, Oppenheimer seeks to depose Doron Cohen and/or one or more Corporate Representatives of A-Labs Advisory & Finance Ltd. Oppenheimer also seeks to obtain relevant records from A-Labs Advisory & Finance Ltd.

## IV.    JUDICIAL ASSISTANCE AND SUBJECT MATTER OF INQUIRY

### 1. DEPOSITIONS

This Court requests the assistance described herein as necessary in the interests of justice. It is requested that the Director of the Courts, or other appropriate judicial or central authority of Israel order, consistent with the laws of Israel governing discovery, the deposition of Doron Cohen and/or one or more Corporate Representatives of A-Labs Advisory & Finance Ltd. ("A-Labs").

The subject matter of inquiry at the deposition will include communications and documents concerning the deponent's knowledge of the investment banking services performed

by Oppenheimer in connection with the Transaction, the Transaction Value and the value of

Oppenheimer's services, as set forth in Schedule A.

This Court further requests the inclusion of the following procedural requirements in

conducting the deposition:

(a)   the examination is to be executed by the Director of the Courts in Israel, or other appropriate judicial authority in accordance with the laws of Israel;

(b)   the testimony of the witness is to be given under oath;

(c)   United States counsel shall have the right to be present on behalf of plaintiff and defendant;

(d)   United States counsel, on behalf of plaintiff and defendant, shall have the right to arrange for the examination of the witness to be recorded by a stenographer or videographer, or both;

(e)   United States counsel, on behalf of plaintiff and defendant, shall have the ability to provide a translator, if necessary;

(f)   United States counsel, on behalf of plaintiff and defendant, shall have the right to conduct the examination and cross examine the witness;

(g)   that United States and Israeli counsel representing the parties to this action receive notification of deposition dates selected in a timely fashion to allow United States counsel to facilitate travel arrangements, if necessary.

## 2. DOCUMENTS

This Court requests the assistance described herein as necessary in the interests of justice.

It is requested that Director of the Courts, or other appropriate judicial or central authority of

Israel order, consistent with the laws of Israel governing discovery, that A-Labs produce the

records sought in Schedule B.

IT IS SO ORDERED
DATED: February 28, 2024


_____
Hon. John P. Cronan
United States District Judge

5

**SCHEDULE A**

It is requested that Director of the Courts compel the testimony of Doron Cohen and/or one or more Corporate Representatives of A-Labs, under oath, on the following subjects:

**DEFINITIONS**

1.        The "Action" refers to the legal action captioned *Oppenheimer & Co. Inc. v. HUB Cyber Security (Israel) Ltd. a/k/a HUB Cyber Security Ltd.*, pending in the United States District Court, Southern District of New York, Case No. 1:23-cv-04909-JPC-JLC.

2.        "*Oppenheimer*" shall mean Plaintiff Oppenheimer & Co. Inc. together with its parents, subsidiaries, affiliates, related entities, officers, employees and attorneys, and any other person or entity acting on or for its behalf.

3.        "A-Labs" shall mean non-party A-Labs Finance & Advisory Ltd. together with its parents, subsidiaries, affiliates, related entities, officers, employees and attorneys, and any other person or entity acting on or for its behalf.

4.        "HUB" shall mean Defendant HUB Cyber Security (Israel) Ltd. a/k/a HUB Cyber Security Ltd. together with its parents, subsidiaries, affiliates, related entities, officers, employees and attorneys, and any other person or entity acting on or for its behalf.

5.        "PurePlay" shall mean non-party PurePlay together with its parents, subsidiaries, affiliates, related entities, officers, employees and attorneys, and any other person or entity acting on or for its behalf.

6.        "PIPE Funds" shall mean "private investment in public equity" ("PIPE") funds, invested by institutional or private investors.

7.     "Investors" shall mean institutional or private investors who were solicited for the purpose of investing PIPE Funds in connection with the Transaction, regardless of whether the investors committed to investing PIPE Funds

8.     "Transaction" shall mean the SPAC business combination between Mr. Rainier and HUB that was announced by HUB on March 23, 2022 and closed on or about February 28, 2023.

9.     Unless stated otherwise, "Transaction Value" shall refer to any estimate or calculation of the value of the Transaction as of the February 28, 2023 closing date.

10.     "Oppenheimer Agreement" shall mean the letter agreement entered into between Oppenheimer and HUB on or about December 24, 2021.

11.     "Amended Agreement" shall mean the agreement referencing the Oppenheimer Agreement that was entered into between Oppenheimer and HUB on or about February 27, 2023.

12.     "Document" shall be construed in the broadest sense.  "Documents" includes, but is not limited to, any writings, drawings, presentations, graphs, charts, photographs, phonograph records, tape recordings, notes, diaries, calendars, books, papers, accounts, electronic or videotape recordings, and any computer-generated, computer-stored, or electronically-stored matter, emails, text messages, including but not limited to, WhatsApp and similar messaging applications, from which information can be obtained and translated, if necessary, into reasonably useable form.

13.     "Communication" shall mean any transmittal of information regardless of form, method, or medium.

14.     The singular shall include the plural and vice versa; the terms "and" or "or" shall be both conjunctive and disjunctive; and the term "including" shall mean "including without limitation."

## DEPOSITION SUBJECTS

1.     Agreements and contracts between HUB and A-Labs, including but not limited to, all discussions and negotiations of any (i) investment banking services agreements; (ii) consulting agreements; (iii) management agreements; (iv) advisory agreements (v) shareholder agreements; (vi) agreements pertaining to PIPE Funds and (vii) any other funding agreements.

2.     The Transaction and the Transaction Value, including but not limited to, documents and communications concerning, (i) HUB's SEC filings and press releases concerning the Transaction and the Transaction Value; (ii) statements made to Investors concerning the Transaction and Transaction Value in connection with PIPE Funds; (iii) calculation of the Transaction Value; and (iv) information received in connection with the Transaction from financial advisors, consultants, accountants and other non-parties concerning the Transaction Value.

3.     The failure or refusal of any Investors to commit to the investment of PIPE Funds in connection with the Transaction.

4.     The impact on the post-closing value of the Transaction stemming from, (i) the failure or refusal of any Investors to commit to the investment of PIPE Funds; (ii) the accuracy of HUB's SEC filings and public statements concerning the commitment of PIPE Funds in connection with the Transaction; and (iii) publicly disclosed allegations concerning the misappropriation of HUB's funds by certain officers and/or directors of HUB.

5.     Fees payable to Oppenheimer for services it provided in connection with the Transaction, including but not limited to, documents and communications concerning HUB's

failure to pay any portion of such fees and HUB's alleged dispute concerning the fees claimed by Oppenheimer.

6.      The services provided by A-Labs in connection with the Transaction and fees payable to A-Labs for services it provided in connection with the Transaction.

7.      The services provided by PurePlay in connection with the Transaction and fees payable to PurePlay for services it provided in connection with the Transaction.

11.      The services provided by AGP in connection with the Transaction and fees payable to AGP for services it provided in connection with the Transaction.

12.      The principal amount of all debt or other liabilities of HUB as of the closing date of the Transaction, including but not limited to HUB's calculation of its debt or other liabilities as of the closing date of the Transaction.

13.      HUB's urgency to complete the Transaction, and HUB's ability to continue as an ongoing concern if the Transaction had not been completed.

14.      The quality of Oppenheimer's services in connection with the Transaction.

14.      Documents and communications between HUB and A-Labs concerning Oppenheimer's performance of its obligations under the Oppenheimer Agreement and the Amended Agreement.

15.      The value of the services Oppenheimer performed under the Oppenheimer Agreement and the Amended Agreement, including but not limited to, facts supporting HUB's allegations that the Oppenheimer is not entitled to a fee in the amount of $12,062,751.14 plus 1% of the principal amount of any debt or other liabilities of HUB as of the closing date of the Transaction.

18.      Statements made by HUB concerning the amount of fees owed to Oppenheimer, including but not limited to, (i) statements made to Investors; (ii) statements made to financial

advisors, consultants, accountants and other non-parties; (iii) statements made to the public in

HUB's SEC filings and press releases; and (iv) statements made to HUB's Board of Directors.

## SCHEDULE B

It is requested that Director of the Courts compel A-Labs, to produce documents for inspection relevant to the following requests:

## DEFINITIONS

1.      "Action" refers to the legal action captioned *Oppenheimer & Co. Inc. v. HUB Cyber Security (Israel) Ltd. a/k/a HUB Cyber Security Ltd.*, pending in the United States District Court, Southern District of New York, Case No. 1:23-cv-04909-JPC-JLC.

2.      "Oppenheimer" shall mean Plaintiff Oppenheimer & Co. Inc. together with its parents, subsidiaries, affiliates, related entities, officers, employees and attorneys, and any other person or entity acting on or for its behalf.

3.      "A-Labs" shall mean non-party A-Labs Finance & Advisory Ltd. together with its parents, subsidiaries, affiliates, related entities, officers, employees and attorneys, and any other person or entity acting on or for its behalf.

4.      "HUB" shall mean Defendant HUB Cyber Security (Israel) Ltd. a/k/a HUB Cyber Security Ltd. together with its parents, subsidiaries, affiliates, related entities, officers, employees and attorneys, and any other person or entity acting on or for its behalf.

5.      "PurePlay" shall mean non-party PurePlay together with its parents, subsidiaries, affiliates, related entities, officers, employees and attorneys, and any other person or entity acting on or for its behalf.

6.      "PIPE Funds" shall mean "private investment in public equity" ("PIPE") funds, invested by institutional or private investors.

7.      "Investors" shall mean institutional or private investors who were solicited for the purpose of investing PIPE Funds in connection with the Transaction, regardless of whether the investors committed to investing PIPE Funds

8.      "Transaction" shall mean the SPAC business combination between Mr. Rainier and HUB that was announced by HUB on March 23, 2022 and closed on or about February 28, 2023.

9.      Unless stated otherwise, "Transaction Value" shall refer to any estimate or calculation of the value of the Transaction as of the February 28, 2023 closing date.

10.     "Oppenheimer Agreement" shall mean the letter agreement entered into between Oppenheimer and HUB on or about December 24, 2021.

11.     "Amended Agreement" shall mean the agreement referencing the Oppenheimer Agreement that was entered into between Oppenheimer and HUB on or about February 27, 2023.

12.     "Document" shall be construed in the broadest sense.  "Documents" includes, but is not limited to, any writings, drawings, presentations, graphs, charts, photographs, phonograph records, tape recordings, notes, diaries, calendars, books, papers, accounts, electronic or videotape recordings, and any computer-generated, computer-stored, or electronically-stored matter, emails, text messages, including but not limited to, WhatsApp and similar messaging applications, from which information can be obtained and translated, if necessary, into reasonably useable form.

13.     "Communication" shall mean any transmittal of information regardless of form, method, or medium.

14.     The singular shall include the plural and vice versa; the terms "and" or "or" shall be both conjunctive and disjunctive; and the term "including" shall mean "including without limitation."

## REQUESTS FOR PRODUCTION

1.      All agreements and contracts relating to A-Labs' relationship with HUB in connection with the Transaction, including, but not limited to: (i) investment banking services agreements; (ii) consulting agreements; (iii) management agreements; (iv) advisory agreements (v) shareholder agreements and (vi) funding agreements.

2.      All communications between A-Labs and HUB concerning the Transaction, including but not limited to: (i) fees payable to A-Labs, Oppenheimer and PurePlay for services related to the Transaction; (ii) the nature and quality of the services performed by A-Labs, Oppenheimer and PurePlay; and (iii) the Transaction Value from January 1, 2021 to the present.

3.      All communications between A-Labs and Oppenheimer and/or Pure Play, concerning the Transaction, including but not limited to: (i) fees payable to A-Labs, Oppenheimer and PurePlay for services related to the Transaction; (ii) the nature and quality of the services performed by A-Labs, Oppenheimer and PurePlay; and (iii) the Transaction Value from January 1, 2021 to the present.

4.      All communications between A-Labs and Mt. Rainier, concerning the Transaction, including but not limited to: (i) fees payable to financial advisors A-Labs, Oppenheimer and PurePlay for services related to the Transaction; (ii) the nature and quality of the services performed by A-Labs, Oppenheimer and PurePlay; and (iii) the Transaction Value from January 1, 2021 to the present.

5.      All internal A-Labs documents and communications concerning the calculation and accuracy of the $1.28 billion Transaction Value HUB announced in its March 23, 2022 SEC filing.

6.      All internal A-Labs documents and communications concerning the calculation and accuracy of the Transaction Value as of the closing date of the Transaction.

7.      All communications between A-Labs and Investors relating or referring to the Transaction Value from January 1, 2021 to the present.

8.      All internal A-Labs documents and communications relating or referring to fees payable for services Oppenheimer performed in connection with the Transaction, or any dispute between Oppenheimer and HUB over fees owed to Oppenheimer.

9.      All documents and communications relating or referring to urgency on the part of HUB to complete the Transaction prior to closing.

10.     All documents concerning HUB's ability to continue as an ongoing concern if the Transaction was not completed.

11.     All documents and communications concerning the amount of any debt or other liabilities of HUB as of the closing date of the Transaction.

12.     All documents and communications related to disclosures that HUB made to investors, potential investors, business partners or any other third party relating to any liability HUB may have to Oppenheimer under the Agreement or the Amended Agreement.

13.     All documents and communications relating or referring to the Oppenheimer Agreement.

14.     All documents and communications relating or referring to the Amended Agreement.

15.     All documents and communications relating to complaints about Oppenheimer's performance under the Oppenheimer Agreement.

16.     All documents and communications relating to complaints about Oppenheimer's performance under the Amended Agreement.

17.     All documents and communications concerning the investment of PIPE Funds in connection with the Transaction from Investors, including but not limited to, (i) the necessity of

PIPE Funds to complete the Transaction; (ii) the inability to obtain commitments from Investors to invest PIPE Funds in the Transaction; (iii) HUB's decision to complete the Transaction without the $50 million in PIPE Funds reflected in HUB's press releases and SEC filings issued on or about March 23, 2022; and (iv) any diminution in the Transaction Value resulting from the inability to obtain PIPE Funds from Investors.

18.     All HUB board materials and/or A-Labs presentations to the HUB Board concerning the Transaction, including but not limited to, (i) the Transaction Value; (ii) Oppenheimer; (iii) PIPE Funds; (iv) fees owed to any party in connection with the Transaction and (iv) this Action.

**EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
— — — — — — — — — — — — — — — — — — — — — — — — — — — — — x

OPPENHEIMER & CO. INC.,                                         :

                      Plaintiff,                          :

            -against-                                     :

HUB CYBER SECURITY (ISRAEL) LTD. a/k/a HUB         :
CYBER SECURITY LTD.,
                                                :

                    Defendant.                         :

— — — — — — — — — — — — — — — — — — — — — — — — — — — — — x

Case No:

**COMPLAINT**

Plaintiff Oppenheimer & Co. Inc. ("Plaintiff" or "Oppenheimer"), by its attorneys, Duane

Morris LLP, as and for its Complaint against Defendant Hub Cyber Security (Israel) Ltd. a/k/a

HUB Cyber Security Ltd. ("Defendant" or "HCSL"), alleges as follows:

### PRELIMINARY STATEMENT

1.      This is an action to recover in excess of $12,000,000 in fees and expenses due to

Oppenheimer by HCSL in connection with investment banking advice and services provided by

Oppenheimer at HCSL's request, and related to HCSL's February 28, 2023 business

combination with non-party Mount Rainier Acquisition Corp. ("Mount Rainier"). Pursuant to

the parties' written agreement, upon the closing of the transaction, Oppenheimer was entitled to

be paid a fee for its services in the amount of one percent (1%) of the transaction value (as

defined in the agreement), plus its expenses. Just days before the subject transaction closed,

HCSL contacted Oppenheimer, acknowledged that Oppenheimer was due a fee of over

$12,000,000 with regard to the anticipated transaction, and requested that Oppenheimer agree to

a significant reduction of the fee due to it. Despite having no obligation to do so, Oppenheimer

conditionally accepted HCSL's request to reduce the fee due to it and the parties executed an

amended agreement stating the new agreed upon fee and payment terms. In the amended agreement Oppenheimer reserved its right to seek the full amount of the fee owed under the original agreement in the event of any breach of the amended agreement payment terms. HCSL breached the amendment, as well as the parties' original agreement, by failing to pay **any** of the fees or the expenses to which Oppenheimer is entitled. As set forth below, HCSL's breach of the parties' agreements entitles Oppenheimer to recover the sum of $12,062,751.12 plus 1% of the principal amount of any debt or other liabilities of HCSL as of the closing date of the transaction, together with interest, as well as its costs and legal fees associated with this action.

**PARTIES**

2.      Plaintiff Oppenheimer & Co. Inc. is a corporation organized and existing pursuant to the laws of the State of New York, which maintains its principal place of business at 85 Broad Street, 25th Floor, New York, New York 10004.

3.      Upon information and belief, Defendant Hub Cyber Security (Israel) Ltd. a/k/a Hub Cyber Security Ltd. is a limited liability company organized and existing pursuant to the laws of the nation of Israel and which maintains its principal place of business located at 17 Rothchild Street, Tel Aviv, Israel.

**JURISDICTION AND VENUE**

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as this matter involves a dispute between a corporation organized pursuant to laws of the State of New York, with its principal place of business located within the State of New York, and a foreign limited liability company with its principal place of business located in the nation of Israel and the amount in controversy is in excess of $75,000.

5.      This Court has jurisdiction over this matter pursuant to the terms of the parties'

2

written agreement in which the parties irrevocably submitted to the jurisdiction of the United States District Court for the Southern District of New York.

6.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial portion of the events and omissions giving rise to Plaintiff's claims occurred within the Southern District of New York.

7.      Venue is appropriate in this District pursuant to the terms of the parties' written agreement in which the parties irrevocably submitted to the jurisdiction of the United States District Court for the Southern District of New York.

**<u>BACKGROUND</u>**

**<u>The Agreement</u>**

8.      Among other services, Oppenheimer is an investment bank that provides emerging growth and mid-sized businesses with strategic advisory services and capital market strategies and investment banking advice and services.

9.      Upon information and belief, HCSL is engaged in the business of providing cybersecurity advice and solutions to its customers.

10.     In or about December of 2021, HCSL approached Oppenheimer and requested that Oppenheimer provide investment banking services and advice to HCSL with regard to the possible sale to or combination with a special purpose acquisition company (often referred to as a "SPAC").

11.     On December 24, 2021, the parties entered into a written agreement regarding, among other things, the investment banking services to be provided by Oppenheimer, as well as the fees and reimbursements to which Oppenheimer would be entitled to in exchange for its investment banking services (the "Agreement").   HCSL's co-founder and former Chief

3

Executive Officer, Eyal Moshe, executed the Agreement on behalf of HCSL. A true and correct

copy of the Agreement is annexed hereto as Exhibit A.

12.     The Agreement provides:

    Oppenheimer will provide [HCSL] with financial advice and assistance in
connection with the Transaction, which may involve, to the extent requested by [HCSL] and
appropriate for the Transaction, advice and assistance in connection with defining strategic
financial objectives, reviewing [HCSL's] historical and projected financial statements,
identifying potential parties to a Transaction, assisting in the preparation of a confidential
memorandum and related materials describing [HCSL] and its business for distribution to
prospective SPACs, and assisting in negotiating the financial terms and structure of the
Transaction.

Agreement, Exhibit A annexed hereto at p.1.

13.     In exchange for the services outlined above, the Agreement provides:

    In connection with this engagement, [HCSL] agrees to pay Oppenheimer in cash
a transaction fee equal to 1% of Transaction Value (as defined below) payable on the closing
date of the Transaction if, during this engagement or within 12 months thereafter, [HCSL]
consummates a Transaction or enters into an agreement and subsequently consummates a
Transaction…

*Id.* at p.2.

14.     While the Agreement acknowledges that HCSL was entitled to utilize two

additional Israeli-based financial advisors with regard to a potential "Transaction", the parties

agreed, "[a]ny fees payable by [HCSL] to [other financial advisors] will not reduce any fees

payable to Oppenheimer hereunder."

*Id.* at p.1.

15.     The Agreement further provides:

    All of Oppenheimer's fees and expenses are payable in U.S. dollars and free and
clear of, and without any deduction or withholding for or on account of, any current or future
taxes, levies, imposts, duties, charges or other deductions or withholdings levied in any
jurisdiction from or through which payment is made, unless such deduction or withholding is
required by applicable law, in which event [HCSL] will pay additional amounts so that the
persons entitled to such payments will receive the amount that such persons would otherwise
have received but for such deduction or withholding.

*Id.* at p. 5.[1]

16.    The Agreement also entitles Oppenheimer to be reimbursed for all of its reasonable out of pocket expenses (including legal fees) associated with the engagement.  *Id.* at p.2.

17.    In the event of a dispute arising out of the Agreement, the Agreement provides that the parties irrevocably submit to the exclusive jurisdiction of the courts of the State of New York located within New York County and the United States District Court for the Southern District of New York.  In connection with any such legal proceeding, the Agreement provides that HCSL expressly and irrevocably consents to the service of process by mail.  *Id.* at p. 5-6.

18.    The Agreement entitles Oppenheimer to recover its costs associated with any breach by HCSL of the Agreement, including, but not limited to, reasonable attorneys' fees. *Id.* at Annex A "Indemnification."

19.    During the time period of approximately December 2021 through the closing of the transaction, Oppenheimer fully complied with its obligations under the Agreement and provided extensive and valuable services to HCSL pursuant to the Agreement.

20.    In March of 2022, in part as a result of the services provided by Oppenheimer, non-party Mount Rainier entered into an agreement with HCSL with regard to the combination of the entities (the "Transaction").  The Transaction constitutes a "Transaction" as defined by the Agreement.

21.     On March 23, 2022, HCSL issued a press release with regard to the Transaction, a copy of which is annexed hereto as Exhibit B.  The press release states, "A-Labs Advisory &

---

[1]      The Agreement also provides that it "and any related confidentiality agreement between Oppenheimer and the Company are the entire agreement between them with respect to Oppenheimer's engagement…and may not be amended or modified except in writing signed by the Company and Oppenheimer." *Id.* at p. 5.

Finance Ltd. and Oppenheimer & Co. Inc. are serving as financial advisors to [HCSL]…"

22.     The press release identified the anticipated value of the Transaction to be approximately $1.28 billion.  *Id.*

23.     On or about August 24, 2022, HCSL filed a Form F-4 Registration Statement with the SEC with regard to the Transaction.  The Form F-4 provides:

> **Certain Engagements in Connection with the Business     Combination and Related Transactions**
>
> [HCSL] engaged A-Labs Finance and Advisory Ltd. ("A-Labs"), Oppenheimer & Co. Inc. ("Oppenheimer") and Cramim S.N. 570 Ltd. ("Cramim") as financial advisors in connection with the Business Combination and related transactions.
>
> * * * *
>
> In connection with the Transactions, Oppenheimer will receive a transaction fee equal to 1% of the aggregate value of [HCSL]…

## The Amended Agreement

24.     Several days prior to the planned closing of the Transaction, HCSL contacted Oppenheimer with regard to the fee to which Oppenheimer was entitled under the Agreement upon the closing of the Transaction, as well as the reimbursements to which Oppenheimer was entitled.

25.     Neither during this conversation, nor during any prior or subsequent conversation, did HCSL dispute that: (i) Oppenheimer had provided its services diligently and fully and in compliance with the Agreement; or (ii) Oppenheimer was entitled to the full fee and reimbursement of expenses provided for within the Agreement.  Despite Oppenheimer's full performance, HCSL requested that Oppenheimer accept a significant discount to the fee to which it was entitled under the Agreement and that the reduced fee be paid out over an extended period.

26.     While under no obligation to do so, Oppenheimer agreed to HCSL's request for a

fee reduction and for a payment of that reduced sum over time.  The parties memorialized the fee

reduction in a written agreement dated February 27, 2023 (the "Amended Agreement").

27.     HCSL executed the Amended Agreement by the signature of its current Chief

Executive Officer, Uzi Moskowitz.

28.     The Amended Agreement expressly references the parties' original Agreement.

29.     With regard to Oppenheimer's agreement to accept a reduced fee in connection

with the Transaction, the Amended Agreement makes clear:

> Subject to Oppenheimer's receipt of the foregoing cash payments in the amounts,
> and at the times, specified in the sentence above, then the transaction fee and out-of-pocket
> expenses payable to Oppenheimer pursuant to the Agreement shall be deemed to have been paid
> in full… **For the sake of clarity, in the event that [HCSL] does not comply with the
> provisions hereof, Oppenheimer retains its right to seek payment of the full transaction fee
> and out-of-pocket expenses as calculated pursuant to the Agreement**.

**HCSL's Breach of the Agreement and the Amended Agreement**

30.     The Transaction (i.e. the business combination between HCSL and Mount

Rainier) closed on February 28, 2023 (the day after the parties executed and delivered the

Amended Agreement).  Annexed hereto as Exhibit C is a true and correct copy of a February 28,

2023 press release filed by HCSL with the SEC titled, "HUB Cyber Security Ltd. a Developer of

Confidential Computing Cybersecurity Solutions and Services, Successfully Closes its Business

Combination with Mount Rainier Acquisition Corp". The press release confirms that the

Transaction closed on February 28, 2023 and, like the press release published on HCSL's

website, identifies Oppenheimer as the company's financial advisor with regard to the

Transaction.

31.     As part of the business combination, a Delaware subsidiary of HCSL merged with

and into Mount Rainier with Mount Rainier surviving the merger, making Mount Rainier a

subsidiary of HCSL. HCSL issued its common shares to the former shareholders of Mount

Rainer who did not elect to redeem their shares; and HCSL became an SEC registrant with securities listed on a United States stock exchange.

32.     Pursuant to the terms of the Amended Agreement, HCSL owed the first installment of Oppenheimer's fee on the closing date of the Transaction, i.e. February 28, 2023.

33.     HCSL failed to make the payment due to Oppenheimer on February 28, 2023.

34.     The day following its default under the Amended Agreement, March 1, 2023, HCSL's management met with Oppenheimer in New York and orally re-affirmed that it would make all payments due under the Amended Agreement.

35.     On April 12, 2023, Oppenheimer sent a letter to HCSL advising that HCSL was in default of the Agreement and the Amended Agreement and demanding that HCSL immediately pay the $12,062,751.14 due under the Agreement, comprised of $12,000,000 in investment banking fees, plus $62,751.14 in reimbursable expenses. Oppenheimer also demanded the HCSL pay 1% of any debt component of the transaction to which Oppenheimer was likewise entitled under the Agreement.

36.     HCSL failed to make the payment demanded by Oppenheimer within its April 12, 2023 letter, or to otherwise dispute that the sums demanded by Oppenheimer pursuant to the Agreement are immediately due and owing by HCSL.

37.     As of the date of this Complaint, HCSL has not paid any portion of the fee that Oppenheimer is entitled to, nor has it reimbursed Oppenheimer for any of its reasonable out-of-pocket expenses associated with regard to the Transaction and as provided for within the Agreement. HCSL's material breach of the Agreement and the Amended Agreement entitle Oppenheimer to recover compensatory damages, as set forth herewith.  Oppenheimer is also entitled to recover pre-judgment interest at the rate of 9% per annum from February 28, 2023

through the entry of judgment, as well as its costs associated with this action, including, but not limited to reasonable attorneys' fees.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Breach of Contract)**

38.     Oppenheimer repeats and re-alleges each and every allegation set forth within Paragraphs 1 through 37 of this Complaint as if set forth in full herein.

39.     Oppenheimer and HCSL entered into an Agreement under which Oppenheimer provided certain investment banking advice and services to HCSL at HCSL's request.

40.     The Agreement constitutes a valid and enforceable contract.

41.     Oppenheimer has performed its obligations pursuant to the Agreement.

42.     HCSL has materially breached the Agreement by, among other things, failing to pay Oppenheimer the fees provided within the Agreement as compensation for Oppenheimer's services, as well as failing to reimburse Oppenheimer for its reasonable out-of-pocket expenses as provided for within the Agreement.

43.     Oppenheimer has been damaged as a result of HCSL's material breach of the Agreement in an amount to be determined through discovery prior to summary judgment, or at trial, but in no event less than $12,062,751.14 plus 1% of the principal amount of any debt or other liabilities of HCSL as of the closing date of the Transaction, together with interest, costs and reasonable attorneys' fees incurred in collecting amounts owed.

### SECOND CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

44.     Oppenheimer repeats and re-alleges each and every allegation set forth within Paragraphs 1 through 43 of this Complaint as if set forth in full herein.

45.     By entering into the Agreement, HCSL undertook an implied obligation of good faith and fair dealing with regard to Oppenheimer.

46.     HCSL has breached its implied covenant of good faith and fair dealing by, among other things, failing to pay Oppenheimer the fees provided within the Agreement as compensation for Oppenheimer's services, as well as failing to reimburse Oppenheimer for its reasonable out-of-pocket expenses as provided for within the Agreement.

47.     Oppenheimer has been damaged as a result of HCSL's breach of the implied covenant of good faith and fair dealing in an amount to be determined through discovery prior to summary judgment, or at trial, but in no event less than $12,062,751.14 plus 1% of the principal amount of any debt or other liabilities of HCSL as of the closing date of the Transaction, together with interest, costs and reasonable attorneys' fees incurred in collecting amounts owed.

### THIRD CAUSE OF ACTION
### (Quantum Meruit)

48.     Oppenheimer repeats and re-alleges each and every allegation set forth within Paragraphs 1 through 47 of this Complaint as if set forth in full herein.

49.     The provision of Oppenheimer's investment banking advice and services to HCSL was at the express request of HCSL.

50.     HCSL accepted Oppenheimer's investment banking advice and services without objection.

51.     HCSL has advertised within its own press release that Oppenheimer provided financial advice on its behalf with regard to the Transaction.

52.     At all times, Oppenheimer reasonably believed that it would be compensated for its investment banking advice and services.

53.     The reasonable and agreed value of the unpaid fee associated with Oppenheimer's

10

investment advice and services related to the Transaction is no less than $12,062,751.14 plus 1% of the principal amount of any debt or other liabilities of HCSL as of the closing date of the Transaction.

## **PRAYER FOR RELIEF**

WHEREFORE, Oppenheimer requests that this Court enter Judgment in favor of Oppenheimer and against HCSL as follows:

(i)      On Plaintiff's First Cause of Action in an amount to be determined at trial, but in no event less than $12,062,751.14 plus 1% of the principal amount of any debt or other liabilities of HCSL as of the closing date of the Transaction, together with interest from February 28, 2023;

(ii)     On Plaintiff's Second Cause of Action in an amount to be determined at trial, but in no event less than $12,062,751.14 plus 1% of the principal amount of any debt or other liabilities of HCSL as of the closing date of the Transaction, together with interest from February 28, 2023;

(iii)    On Plaintiff's Third Cause of Action in an amount to be determined at trial, but in no event less than $12,062,751.14 plus 1% of the principal amount of any debt or other liabilities of HCSL as of the closing date of the Transaction, together with interest from February 28, 2023;

(iv)    Awarding Oppenheimer recovery of all of its costs incurred in connection with this action, including but not limited to the reasonable fees and expenses of its counsel; and

(v)     Awarding Oppenheimer such further relief as this Court deems just and proper.

Dated: New York, New York
June 12, 2023

DUANE MORRIS LLP

_____

By:    Michael H. Gibson (MG-2952)
        Walter A. Saurack (WS-8815)
230 Park Avenue, Suite 1130
New York, New York 10169
(212) 818-9200
mhgibson@duanemorris.com
wasaurack@duanemorris.com
*Attorneys for Plaintiff*
*Oppenheimer & Co. Inc.*

# EXHIBIT A

DocuSign Envelope ID: C0021055-838A-4533-9615-1EFC6BAAEE8C



Oppenheimer & Co. Inc.
85 Broad Street
25th Floor
New York, NY 10004
Phone: 212-668-8000

Transacts Business on All Principal Exchanges

**December 24, 2021**

PERSONAL AND CONFIDENTIAL

**Hub Cyber Security (Israel) Ltd.**
**17 Rothschild St.**
**Tel Aviv, Israel**

Attention:      **Eyal Moshe**
                **Co-Founder and CEO**

Ladies and Gentlemen:

This letter agreement confirms that **Hub Cyber Security (Israel) Ltd.** (together with its subsidiaries and affiliates, the **"Company"**) has engaged Oppenheimer & Co. Inc. (**"Oppenheimer"**) to act as a financial advisor to the Company in connection with a possible sale to, merger with, acquisition of or any other extraordinary corporate transaction involving all or a significant portion of the assets or securities of the Company with a special purpose acquisition company (a **"SPAC"**), regardless of the form or structure thereof, whether in one or a series of transactions, in connection with a SPAC's initial business combination (the **"Business Combination"** or the **"Transaction"**). Oppenheimer understands that the Company has separately engaged A-Labs Finance & Advisory Ltd. (**"A-Labs"**) and Pureplay Ltd. (**"Pureplay"**) in Israel as financial advisors to the Company in connection with a Transaction. Each of Oppenheimer's, A-Labs' and Pureplay's responsibilities in connection with a Transaction are several and not joint. The Company will not engage any additional financial advisors in connection with a Transaction and any fees payable by the Company to A-Labs and/or Pureplay will not reduce any fees payable to Oppenheimer hereunder.

*Services.*  Oppenheimer will provide the Company with financial advice and assistance in connection with the Transaction, which may involve, to the extent requested by the Company and appropriate for the Transaction, advice and assistance in connection with defining strategic and financial objectives, reviewing the Company's historical and projected financial statements, identifying potential parties to a Transaction, assisting in the preparation of a confidential memorandum and related materials describing the Company and its business for distribution to prospective SPACs, and assisting in negotiating the financial terms and structure of the Transaction.

Oppenheimer's services do not include providing legal, regulatory, accounting or tax advice or developing any tax strategies for the Company. If the Company should request Oppenheimer to provide additional services not otherwise contemplated by this letter agreement, the Company and Oppenheimer will amend this agreement or enter into an additional letter agreement which will set forth the nature and scope of the services, appropriate compensation and other customary matters, as mutually agreed upon by the Company and Oppenheimer.

DocuSign Envelope ID: C0021055-838A-4533-9615-1EFC6BAAEE8C

In order to coordinate efforts in connection with the Transaction, the Company and Oppenheimer will inform and consult with each other promptly with respect to inquiries received from third parties in connection with, and the status of, the Transaction.

*Compensation.* In connection with this engagement, the Company agrees to pay Oppenheimer in cash a transaction fee equal to 1.00% of Transaction Value (as defined below) payable on the closing date of the Transaction if, during this engagement or within 12 months thereafter, the Company consummates a Transaction or enters into an agreement and subsequently consummates a Transaction [Note: "Transaction" is defined as a transaction with a SPAC].

If the Company does not consummate a Transaction but receives either a "break-up" fee or any other payment as a result of the termination of a Transaction (including any fee or other payment related to any litigation in respect of a terminated Transaction, including settlement proceeds) or realizes any profits from the exercise of any options or warrants granted to the Company in connection with a Transaction, then the Company will pay to Oppenheimer a fee equal to 20% of the profit actually received by the Company after deduction of all its related expenses.

As used in this letter agreement, **"Transaction Value"** means (i) if the SPAC acquires the Company, the total value of all consideration (including cash, securities or other property) paid or to be paid to the Company or its stakeholders in connection with the Transaction, or (ii) if the Company acquires the SPAC, the aggregate value of the Company implied by the value of shares of the Company issued to the SPAC or its shareholders in the Transaction, in either case on a fully diluted basis (treating any securities issuable upon the exercise of options, warrants or other convertible securities and any securities to be redeemed as outstanding, whether or not vested), plus the principal amount of any debt (including capitalized leases) or other liabilities (to the extent treated akin to indebtedness by an acquirer) of the Company outstanding as of the closing date of the Transaction or directly or indirectly assumed, refinanced or extinguished in connection with the Transaction, and amounts payable in connection with the Transaction in respect of extraordinary employment or consulting agreements, agreements not to compete or similar arrangements. If the Transaction takes the form of a recapitalization or any transaction where less than 100% of the outstanding shares of the Company are sold, "Transaction Value" will also include the value of all shares retained by the shareholders of the Company. If any portion of Transaction Value is payable in the form of securities, the value of such securities, for purposes of calculating the Transaction Fee, will be determined based on the average closing price for such securities for the 5 trading days prior to the announcement of the Transaction. In the case of securities that do not have an existing public market, the Transaction Fee will be determined based on the fair market value of such securities as mutually agreed upon in good faith by the Company and Oppenheimer prior to the closing of the Transaction. Fees on amounts paid into escrow will be payable upon the release of such escrow. Fees relating to contingent payments other than escrowed amounts will be calculated based on the present value of the reasonably expected amount of such contingent payments as determined in good faith by the Company and Oppenheimer prior to the closing of the Transaction, utilizing a discount rate equal to the prime rate published in The Wall Street Journal on the last business day preceding the closing of the Transaction.

The Company also agrees to reimburse Oppenheimer promptly when invoiced for all of its reasonable out-of-pocket expenses (including reasonable fees and out-of-pocket expenses of its legal counsel) in connection with the performance of its services hereunder, regardless of whether a Transaction occurs. Upon termination of this letter agreement or completion of a Transaction,

the Company agrees to pay promptly in cash any unreimbursed expenses that have accrued as of such date. To the extent officers and employees of Oppenheimer assist in, or provide testimony in trial or deposition for any action, suit or proceeding relating to a Transaction or Oppenheimer's engagement hereunder, the Company will pay Oppenheimer a per diem charge for the services of such officers and employees in an amount to be mutually agreed upon by the Company and Oppenheimer prior to such assistance.

*Term.* This engagement will commence on the date of this letter agreement and terminate three (3) business days from the date on which a party receives written notice from the other party of termination of this engagement. Notwithstanding the foregoing, the provisions relating to the payment of fees, reimbursement of expenses, right of first refusal, indemnification and contribution, independent contractor, other relationships, confidentiality, governing law, consent to jurisdiction and waiver of the right to trial by jury will survive any termination.

*Right of First Refusal.* During this engagement (and, if no Transaction is consummated, within 12 months of the termination of this engagement), if the Company (i) sells or otherwise transfers, whether in one or a series of transactions, all or a significant portion of its assets or securities, or engages in any similar extraordinary corporate transaction, regardless of the form or structure of such transaction, in each case, to a party other than a SPAC in a transaction that is not a Transaction hereunder, then Oppenheimer will have a right of first refusal to act as exclusive financial advisor to the Company in connection with such transaction or (ii) pursues an initial public offering of its securities in the United States, then Oppenheimer will have a right of first refusal to act as lead-left bookrunning underwriter in connection with such initial public offering, with Oppenheimer entitled to minimum "economics" of 50.0%. In the event the Company advises Oppenheimer that it desires to effect any such transaction or offering, the Company and Oppenheimer will negotiate in good faith the terms of Oppenheimer's engagement in a separate agreement, which agreement would set forth, among other matters, compensation for Oppenheimer based upon customary fees for the services provided. Oppenheimer's participation in any such transaction or offering will be subject to Oppenheimer's internal approval process and other conditions customary for such an undertaking.

*Indemnification.* As Oppenheimer will be acting on the Company's behalf, the Company agrees to indemnify and reimburse Oppenheimer and certain related parties as set forth in Annex A.

*Use of Information.* The Company will furnish (and will use commercially reasonable efforts to cause other potential parties to the Transaction to furnish) Oppenheimer such information as Oppenheimer requests for purposes of performing the services under this letter agreement (the "Information"). The Company agrees that all Information relating to the Company furnished to Oppenheimer will be to its knowledge accurate and complete in all material respects at the time provided, and that, if the Company becomes aware that any Information has become materially inaccurate, incomplete or misleading during this engagement, the Company will promptly advise Oppenheimer. Oppenheimer assumes no responsibility for the accuracy and completeness of the Information (or information available from generally recognized public sources) and will use and rely on the Information (and information available from generally recognized public sources) without assuming responsibility for independent verification. Oppenheimer will not conduct an independent evaluation of any of the assets or liabilities (contingent or otherwise) of the Company.

DocuSign Envelope ID: C0021055-838A-4533-9815-1EFC8BAAEE6C

*Independent Contractor.* Oppenheimer is acting hereunder as an independent contractor and not as a fiduciary, agent or trustee, to the Company or any other person. In performing its services hereunder, Oppenheimer shall act solely pursuant to this contractual relationship on an arm's length basis with duties owed solely to the Company. Neither this engagement nor the delivery of any advice in connection with this engagement confers any rights (directly or indirectly as a third party beneficiary or otherwise) upon security holders or creditors of the Company or any other parties as against Oppenheimer or any other Indemnified Party (as defined in Annex A hereto).

*Confidentiality.* The fact that Oppenheimer has been engaged hereunder, this letter agreement and the terms hereof, and any service, information or advice provided by Oppenheimer to the Company in connection with this engagement is for the confidential use of the Board of Directors and senior management of the Company and may not be disclosed or referred to publicly or to any third party without Oppenheimer's prior written consent, which consent will not be unreasonably withheld. Oppenheimer confirms its obligations pursuant to the confidentiality agreement, dated December 8, 2021, between the Company and Oppenheimer.

*Other Relationships.* Oppenheimer and its affiliates have and may continue to have investment banking and other relationships with parties other than the Company, who may be competitors of or actual or potential counterparties with the Company. Oppenheimer's policy is to inform its clients generally of its relevant investment banking relationships consistent with confidentiality obligations to clients. Pursuant to such relationships, Oppenheimer may acquire information of interest to the Company. Oppenheimer shall have no obligation to disclose such information to the Company or to use such information to the Company's benefit in connection with any contemplated Transaction. In addition, in the ordinary course of business, Oppenheimer may trade the securities of the Company and potential purchasers and/or participants in the Transaction for its own account and for the accounts of customers, and may at any time hold a long or short position in such securities. Oppenheimer recognizes its responsibilities for compliance with federal securities laws and regulations in connection with such activities in light of this letter agreement.

From time to time Oppenheimer's research department may publish research reports or other materials, the substance and/or timing of which may conflict with the views or advice of the members of Oppenheimer's investment banking department, and may have an adverse effect on the Company's interests in connection with the Transaction or otherwise. Oppenheimer's investment banking department is managed separately from its research department, and does not have the ability to prevent such occurrences. Affiliates of Oppenheimer and each of their directors, officers and employees may also at any time invest on a principal basis or manage or advise funds that invest on a principal basis in any company that may be involved in the transactions contemplated hereby.

In the event that Oppenheimer's investment banking department were to pursue an investment banking engagement for a party other than the Company and such engagement, in Oppenheimer's determination, would present Oppenheimer with a conflict of interest with respect to Oppenheimer's engagement hereunder, Oppenheimer would disclose such conflict to the Company (consistent with confidentiality obligations to clients) and assign separate internal deal teams to each engagement and implement procedures designed to control each such team's access to the other client's non-public information.

4

DocuSign Envelope ID: C0021055-838A-4533-9615-1EFC6BAAEE8C

*Anti-Money Laundering.* To help the United States government fight the funding of terrorism and money laundering activities, the federal law of the United States requires financial institutions to obtain, verify and record information that identifies each person with whom they do business. This means Oppenheimer must ask the Company and certain of its officers, directors and significant shareholders for certain identifying information, including a government-issued identification number (e.g., a U.S. taxpayer identification number) and such other information or documents that Oppenheimer considers appropriate to verify the Company's and such other person's identity, such as certified articles of incorporation, a government-issued business license, a partnership agreement or a trust instrument.

*Conflict Disclosure.* Oppenheimer expects to seek to be engaged by the SPAC as its placement agent in connection with any PIPE conducted by the SPAC to raise capital in connection with the consummation of the Business Combination. In connection with any such engagement, Oppenheimer may receive a transaction fee based on the gross proceeds raised in the PIPE. Members of the Oppenheimer team advising the SPAC in connection with the PIPE will also advise the Company in connection with the Business Combination and the PIPE. Oppenheimer's advice to the SPAC will be intended to advantage the SPAC in connection with the PIPE. Oppenheimer will not advise the SPAC in connection with its proposed acquisition of the Company. It is possible that in connection with Oppenheimer's engagement by the SPAC, Oppenheimer will receive information not available to the Company which Oppenheimer uses to advise the SPAC and does not use to advise the Company. The Company accepts Oppenheimer's future engagement by the SPAC and the limitations described in this paragraph on Oppenheimer advising the Company in connection with its acquisition by the SPAC. The Company agrees that it will use its best efforts to (i) cause the SPAC to grant Oppenheimer the opportunity to pitch for a placement agent role on the PIPE and (ii) cause the SPAC to engage Oppenheimer as a placement agent for the PIPE.

*Miscellaneous.* This letter agreement, including Annex A hereto, and any related matters will be governed by and construed in accordance with the laws of the State of New York. The parties irrevocably submit to the exclusive jurisdiction and convenient venue of any court of the State of New York located in the City and County of New York or in the United States District Court for the Southern District of New York for the purpose of any suit, action or other proceeding arising out of or related to this letter agreement (or Annex A). This letter agreement and any related confidentiality agreement between Oppenheimer and the Company are the entire agreement between them with respect to Oppenheimer's engagement. It may be executed in two or more counterparts, each of which will be deemed to be an original, but all of which will constitute one and the same agreement, and may not be amended or modified except in writing signed by the Company and Oppenheimer. All rights, liabilities and obligations hereunder will be binding upon and inure to the benefit of the Company, Oppenheimer, each Indemnified Party (as defined in Annex A) and their respective successors and assigns.

All of Oppenheimer's fees and expenses are payable in U.S. dollars and free and clear of, and without any deduction or withholding for or on account of, any current or future taxes, levies, imposts, duties, charges or other deductions or withholdings levied in any jurisdiction from or through which payment is made, unless such deduction or withholding is required by applicable law, in which event the Company will pay additional amounts so that the persons entitled to such payments will receive the amount that such persons would otherwise have received but for such deduction or withholding. The Company hereby irrevocably consents to the service of process in any proceeding by the mailing of copies of such process to the Company at its address set forth

DocuSign Envelope ID: C0021055-838A-4533-9615-1EFC6BAAEE8C

above.

Each party waives any right to a trial by jury in respect of any claim brought by or on behalf of such party based upon, arising out of or in connection with this letter agreement, Oppenheimer's engagement hereunder or the transactions contemplated hereby.

The Company represents and warrants to Oppenheimer that there are no brokers, representatives or other persons that have an interest in compensation due to Oppenheimer from any Transaction or Oppenheimer's services contemplated herein.

Oppenheimer may, at its own expense, place announcements or advertisements in financial newspapers and journals describing Oppenheimer's services hereunder (but not any non-public information) following the consummation of a Transaction.

*[Remainder of page intentionally left blank. Signature page to follow.]*

DocuSign Envelope ID: C0021055-838A-4533-9615-1EFC6BAAEE8C

Please confirm our mutual understanding of this engagement by signing and returning to us the enclosed duplicate copy of this letter agreement. Oppenheimer is pleased to act as the Company's financial advisor for the proposed Transaction and is looking forward to working with the Company on this assignment.

Very truly yours,

**OPPENHEIMER & CO. INC.**

By: _____

**Matthew Russell**
**Managing Director**

Agreed to and accepted as
of the above date.

Hub Cyber Security (Israel) Ltd.

By: _____

**Eyal Moshe**
**Co-Founder and CEO**

7

**Hub Cyber Security (Israel) Ltd.**
**Date: December 24, 2021**

### ANNEX A: INDEMNIFICATION

The Company agrees to indemnify and hold harmless Oppenheimer and its affiliates and their respective present and former directors, officers, employees, agents and controlling persons (each such person, including Oppenheimer, an "Indemnified Party") from and against any losses, claims, damages and liabilities, joint or several (collectively, "Damages"), to which such Indemnified Party may become subject in connection with, relating to or arising from any transaction contemplated by this Agreement or the engagement of or performance of services by an Indemnified Party hereunder, and will reimburse each Indemnified Party for all out-of-pocket fees and expenses ("Expenses"), including the reasonable fees and expenses of counsel, as they are incurred in connection with investigating, preparing, pursuing or defending any threatened or pending subpoena, claim, action, proceeding or investigation ("Proceedings") arising therefrom, whether or not any Indemnified Party is a formal party to such Proceeding; provided, that the Company will not be liable to any Indemnified Party to the extent that any Damages are found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from the bad faith, gross negligence or willful misconduct of the Indemnified Party. No Indemnified Party will have any liability (whether direct or indirect, in contract, tort or otherwise) to the Company or any person asserting claims on behalf of the Company arising out of or in connection with any transactions contemplated by this Agreement or the engagement of or performance of services by any Indemnified Party hereunder except to the extent that the Company incurs Damages that are found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from the bad faith, gross negligence or willful misconduct of the Indemnified Party.

If for any reason other than in accordance with the previous paragraph of this Annex A, the foregoing indemnity is unavailable to an Indemnified Party or insufficient to hold an Indemnified Party harmless, then the Company will contribute to the amount paid or payable by an Indemnified Party for Damages and Expenses related thereto in such proportion as is appropriate to reflect the relative benefits to the Company and/or its stockholders on the one hand, and Oppenheimer on the other hand, in connection with the matters covered by this Agreement or, if the foregoing allocation is not permitted by applicable law, not only such relative benefits but also the relative faults of such parties as well as any relevant equitable considerations. The Company agrees that for purposes of this paragraph the relative benefits to the Company and/or its stockholders and Oppenheimer in connection with the matters covered by this Agreement will be deemed to be in the same proportion that the total value paid or received or to be paid or received by the Company and/or its stockholders in connection with the transactions contemplated by this Agreement, whether or not consummated, bears to the fees paid to Oppenheimer under this Agreement; provided, that in no event will the total contribution of all Indemnified Parties to all such Damages and Expenses exceed the amount of fees actually received and retained by Oppenheimer under this Agreement (excluding any amounts received by Oppenheimer as reimbursement of expenses). Relative fault shall be determined by reference to, among other things, whether any alleged untrue statement or omission or any alleged conduct relates to information provided by the Company or other conduct by the Company (or its employees or other agents) on the one hand, or by Oppenheimer, on the other hand.

DocuSign Envelope ID: C002105S-838A-4533-9615-1EFC6DAAEE8C

No Indemnified Party will agree to settle any Proceeding and seek indemnification or reimbursement hereunder unless such Indemnified Party obtained the Company's consent (which consent will not be unreasonably withheld) to such settlement. The Company agrees not to enter into any waiver, release or settlement of any Proceeding (whether or not any Indemnified Party is a party thereto) in respect of which indemnification may be sought hereunder without the prior written consent of Oppenheimer (which consent will not be unreasonably withheld), unless such waiver, release or settlement (i) includes an unconditional release of each Indemnified Party from all liability arising out of such Proceeding, (ii) does not contain any factual or legal admission by or with respect to any Indemnified Party or any adverse statement with respect to the character, professionalism, expertise or reputation of any Indemnified Party or any action or inaction of any Indemnified Party and (iii) does not preclude or purport to preclude the future business activities of any Indemnified Person.

In addition to any rights of indemnification or contribution set forth above, the Company agrees to reimburse each Indemnified Party for all out-of-pocket costs and expenses as they are incurred (including, without limitation, the reasonable fees and expenses of outside counsel) in connection with investigating, preparing or settling any Proceeding involving the enforcement of this Agreement or this Annex A.

The indemnity, reimbursement and contribution obligations of the Company are in addition to any liability that the Company may have at common law or otherwise to any Indemnified Party and will be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company or an Indemnified Party. The provisions of this Annex will survive the modification, expiration or termination of this Agreement.

DocuSign Envelope ID: C0021055-838A-4533-9615-1EFC6BAACE8C

# EXHIBIT B

# HUB Security, Developer of Confidential Computing Solutions for Enterprises & Governments, to Become Publicly Traded on Nasdaq Through Business Combination with Mount Rainier Acquisition Corp

- HUB Cyber Security Israel Limited ("HUB"), founded by veterans of elite Israeli intelligence units (8200, 81, MOD, C4I-IDF), is disrupting cybersecurity with its proprietary Confidential Computing hardware provided to enterprises and governments

- The business combination implies pro forma enterprise value of approximately $1.28 billion, providing HUB with up to approximately $200 million in additional cash, assuming no redemptions by Mount Rainier's public stockholders

- HUB entered into Subscription Agreements with Israeli and American institutional investors for gross proceeds of approximately $50 million through a private placement

- Representing sufficient capital to meet the minimum cash required to close the proposed transaction and to fund HUB's business plan and acquisitions

- Current HUB shareholders will retain 100% of their equity and will continue to own approximately 81% of the combined company on a pro forma basis, assuming no redemptions by Mount Rainier's stockholders

- Founder & CEO Eyal Moshe will continue to own approximately 7% of the combined company on a pro forma basis, assuming no redemptions by Mount Rainier's public stockholders

NEWS PROVIDED BY
**HUB Security; Mount Rainier Acquisition Corp** →
23 Mar, 2022, 07:10 ET

TEL AVIV, Israel and NEW YORK, March 23, 2022 /PRNewswire/ -- HUB Cyber Security (Israel) Limited (TASE: HUB), a Tel-Aviv based developer of Confidential Computing cybersecurity solutions and services ("HUB" or the "Company"), and Mount Rainier Acquisition Corp. (NASDAQ: RNER), a U.S. publicly traded special purpose acquisition company ("RNER"), today announced that they have entered into a definitive business combination agreement. Upon closing of the proposed transaction, the combined company (the "Combined Company") will operate under the "HUB Security" name and is expected to be listed on Nasdaq under the new ticker symbol "HUBC."

HUB develops and markets Confidential Computing solutions and services that aim to disrupt cybersecurity for enterprises and governments worldwide. HUB's proprietary hardware solutions enable the protection of sensitive IT data through a computer's RAM memory or processor, creating a Trusted Execution Environment (TEE). HUB provides a holistic cyber defense of end-to-end data protection across all phases of the data lifecycle and offers next-generation encryption solutions, including advanced quantum computing defense. The Company has received FIPS 140-2 Level 3 to meet stringent U.S. security standards and the highest level of security for cryptographic modules.

HUB operates in a rapidly growing Confidential Computing market that is expected to reach $54 billion by 2026 at a CAGR of 95%-100%, according to Confidential Computing Research 2021, published by Everest Group Inc.

HUB's solutions and services are delivered to enterprises including, but not limited to, insurance companies, commercial banks, payment companies, telecom operators, and governmental entities primarily through long-term contracts.

HUB's Founder, Chief Executive Officer, Eyal Moshe and the current management team will continue to lead the Combined Company.

Moshe said, "We have a wide range of game-changing cybersecurity hardware technology and services for better global cyber defense. The U.S. is our prime target market for growth and we seek to expand our U.S. operations significantly via this business combination. We are passionate and excited about this opportunity to become publicly listed in the U.S. on Nasdaq and to continue our growth and global expansion."

Matthew Kearney, Chairman and CEO of RNER, said, "Our mission is to find a high quality, well led, technology backed business whose high growth potential would be accelerated by merger with our company. HUB meets all these criteria and we are delighted to be able to recommend this business combination to our stockholders. We look forward to working with Eyal and the HUB team through to its successful listing."

**Transaction Overview**

The Combined Company will have an estimated pro forma enterprise valuation of approximately $1.28 billion. Cash proceeds from the proposed transaction are expected to consist of up to approximately $176 million of cash held in RNER's trust (before any redemptions by RNER's public stockholders and the payment of certain expenses) and approximately $50 million attributed to the PIPE investment anchored by Israeli and American institutional and existing investors. Proceeds from the PIPE are expected to satisfy the minimum cash closing condition and will be used as working capital to support continued growth and to fund acquisitions.

HUB shareholders will retain 100% of their existing equity holdings and are expected to own approximately 81% of the Combined Company on a non-fully diluted basis immediately following the closing of the proposed transaction, assuming no redemptions by RNER's public stockholders. Founder & CEO Eyal Moshe will continue to own approximately 6% of the combined company on a pro forma basis, assuming no redemptions by RNER's public stockholders.

The board of directors of each of RNER and HUB approved the proposed transaction. The proposed transaction will require the approval of the stockholders of RNER and HUB, the effectiveness of a registration statement to be filed with the Securities and Exchange Commission (the "SEC") in connection with the proposed transaction, and the satisfaction of other customary closing conditions. The proposed transaction is expected to close in the third quarter of 2022.

Additional information about the proposed transaction, including a copy of the business combination agreement and investor presentation, is available in the Form 8-K filed today with the SEC by RNER at www.sec.gov.

A-Labs Advisory & Finance Ltd. ("ALabs") and Oppenheimer & Co. Inc. are serving as financial advisors to HUB, and ALabs is serving as sole placement agent for the PIPE. Latham & Watkins LLP and Pearl Cohen Zedek Latzer Baratz are serving as legal advisors to HUB. A.G.P./Alliance Global Partners is serving as the exclusive financial advisor to RNER. Loeb & Loeb LLP and Sullivan & Worcester LLP (Tel Aviv) are serving as legal advisors to RNER.

## About HUB Cyber Security (Israel) Limited

HUB Cyber Security (Israel) Limited ("HUB") was established in 2017 by veterans of the 8200 and 81 elite intelligence units of the Israeli Defense Forces. The company specializes in unique Cyber Security solutions protecting sensitive commercial and government information. The company debuted an advanced encrypted computing solution aimed at preventing hostile intrusions at the hardware level while introducing a novel set of data theft prevention solutions. HUB operates in over 30 countries and provides innovative cybersecurity computing appliances as well as a wide range of cybersecurity services worldwide.

## About Mount Rainier Acquisition Corp.

Mount Rainier Acquisition Corp. is a blank check company sponsored by DC Rainier SPV LLC, a Delaware limited liability company managed by Dominion Capital LLC, whose business purpose is to effect a merger, share exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.

## Forward-Looking Statements

Certain statements included in this press release are not historical facts but are forward-looking statements for purposes of the safe harbor provisions under the United States Private Securities Litigation Reform Act of 1995. Forward-looking statements generally relate to future events or HUB's or RNER's future financial or operating performance. In some cases, you can identify forward-looking statements by terminology such as "may", "should", "would", "seem", "expect", "intend", "will", "estimate", "anticipate", "believe", "future", "predict", "potential," "forecast" or

"continue", or the negatives of these terms or variations of them or similar terminology, but the absence of these words does not mean that a statement is not forward-looking. Such forward-looking statements are subject to risks, uncertainties, and other factors that could cause actual results to differ materially from those expressed or implied by such forward looking statements.

These forward-looking statements are based upon estimates and assumptions that, while considered reasonable by HUB and its management, and RNER and its management, as the case may be, are inherently uncertain. These forward-looking statements are provided for illustrative purposes only and are not intended to serve as, and must not be relied on by any investor as, a guarantee, an assurance, a prediction or a definitive statement of fact or probability. Actual events and circumstances are difficult or impossible to predict and may differ from assumptions. Many actual events and circumstances are beyond the control of HUB or RNER. Factors that may cause actual results to differ materially from current expectations include, but are not limited to: (i) expectations regarding HUB's strategies and future financial performance, including its future business plans or objectives, prospective performance and opportunities and competitors, revenues, products and services, pricing, operating expenses, market trends, liquidity, cash flows and uses of cash, capital expenditures, and HUB's ability to invest in growth initiatives and pursue acquisition opportunities; (ii) the occurrence of any event, change or other circumstances that could give rise to the termination of negotiations and any subsequent definitive agreements with respect to the proposed transactions; (iii) the outcome of any legal proceedings that may be instituted against RNER, HUB, the Combined Company or others following the announcement of the proposed transactions and any definitive agreements with respect thereto; (iv) the inability to complete the proposed transactions due to, among other things, the failure to obtain approval of the stockholders of RNER or HUB, to obtain certain governmental and regulatory approvals or to satisfy other conditions to closing, including delays in obtaining, adverse conditions contained in, or the inability to obtain necessary regulatory approvals or complete regulatory reviews required to complete the proposed transactions; (v) the inability to obtain the financing necessary to consummate the proposed transactions; (vi) changes to the proposed structure of the proposed transactions that may be required or appropriate as a result of applicable laws or regulations or as a condition to obtaining regulatory approval of the proposed transactions; (vii) the ability to meet stock exchange listing standards following the consummation of the proposed transactions; (viii) the risk that the announcement and consummation of the proposed transactions disrupts HUB's current plans and operations; (ix) the lack of a third party valuation in determining whether or not to pursue the proposed transactions; (x) the ability to

recognize the anticipated benefits of the proposed transactions, which may be affected by, among other things, competition, the ability of the Combined Company to grow and manage growth profitably, maintain relationships with customers and suppliers and retain its management and key employees; (xi) costs related to the proposed transactions; (xii) the amount of any redemptions by existing holders of RNER's common stock being greater than expected; (xiii) limited liquidity and trading of RNER's and HUB's securities; (xiv) geopolitical risk, including military action and related sanctions, and changes in applicable laws or regulations; (xv) geopolitical risk, including military action and related sanctions, and changes in applicable laws or regulations; (xvi) the possibility that RNER, HUB or the Combined Company may be adversely affected by other economic, business, and/or competitive factors; (xvii) inaccuracies for any reason in the estimates of expenses and profitability and projected financial information for HUB; and (xviii) other risks and uncertainties set forth in the section entitled "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements" in RNER's final prospectus relating to its initial public offering dated October 4, 2021.

Forward-looking statements speak only as of the date they are made. Nothing in this press release should be regarded as a representation by any person that the forward-looking statements set forth herein will be achieved or that any of the contemplated results of such forward-looking statements will be achieved. You should not place undue reliance on forward-looking statements, which speak only as of the date they are made. Neither HUB nor RNER undertakes any duty to update these forward-looking statements.

**Additional Information About the Transaction and Where to Find It**

In connection with the proposed transaction, HUB intends to file with the SEC a registration statement on Form F-4 containing a proxy statement/prospectus, and after the registration statement is declared effective by the SEC, RNER will mail a definitive proxy statement/prospectus relating to the Proposed Business Combination to its stockholders. This press release does not contain all the information that should be considered concerning the proposed transaction and is not intended to form the basis of any investment decision or any other decision in respect of the proposed transaction. This press release is not a substitute for any registration statement or for any other document that HUB or RNER may file with the SEC in connection with the proposed transaction. Investors and security holders are advised to read, when available, the preliminary proxy statement/prospectus and the amendments

thereto and the definitive proxy statement/prospectus and other documents filed in connection with the proposed transaction, as these materials will contain important information about HUB, RNER and the proposed transaction.

When available, the definitive proxy statement/prospectus and other relevant materials for the proposed transaction will be mailed to stockholders of RNER as of a record date to be established for voting on the proposed transaction. Stockholders will also be able to obtain copies of the preliminary proxy statement/prospectus, the definitive proxy statement/prospectus and other documents filed with the SEC, without charge, once available, through the website maintained by the SEC at www.sec.gov. INVESTORS AND SECURITY HOLDERS ARE URGED TO READ THE DOCUMENTS FILED WITH THE SEC CAREFULLY AND IN THEIR ENTIRETY WHEN THEY BECOME AVAILABLE BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION.

## Participants in the Solicitation

HUB and RNER and their respective directors and executive officers, under SEC rules, may be deemed participants in the solicitation of proxies from RNER's stockholders in connection with the proposed transaction. A list of the names of those directors and executive officers and a description of their interests in RNER is contained in RNER's final prospectus relating to its initial public offering dated October 4, 2021, which was filed with the SEC and is available free of charge at the SEC's web site at www.sec.gov. Additional information regarding the names and interests will be set forth in the proxy statement/prospectus for the proposed transaction when available. HUB and its directors and executive officers may also be deemed to be participants in the solicitation of proxies from the stockholders of RNER in connection with the proposed transaction. A list of the names of such directors and executive officers and information regarding their interests in the proposed transaction will be set forth in the proxy statement/prospectus filed as part of the registration statement on Form F-4 for the proposed transaction, which is expected to be filed by HUB with the SEC.

## No Offer or Solicitation

This communication does not constitute an offer to sell or exchange, or the solicitation of an offer to buy or exchange any securities, or a solicitation of any vote or approval, nor shall there be any sale of securities in any jurisdiction in which such offer, solicitation, sale, or exchange would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. No offering of securities shall be made except by means of a prospectus meeting the requirements of section 10 of the Securities Act, or an exemption therefrom.

SOURCE HUB Security; Mount Rainier Acquisition Corp



## PRN Top Stories Newsletters

Sign up to get PRN's top stories and curated news delivered to your inbox weekly!

# EXHIBIT C

Exhibit 99.1

### HUB Cyber Security Ltd, a Developer of Confidential Computing Cybersecurity Solutions and Services, Successfully Closes Its Business Combination with Mount Rainier Acquisition Corp.

*HUB shares to commence trading on the Nasdaq Global Market under the ticker "HUBC" on March 1, 2023*

**TEL AVIV, Israel – Feb. 28, 2023** – HUB Cyber Security Ltd., a developer of Confidential Computing cybersecurity solutions and services ("HUB" or the "Company") and Mount Rainier Acquisition Corp. (Nasdaq: RNER), today announced the completion of their previously announced business combination, and will begin trading on the Nasdaq Stock Market tomorrow, March 1, 2023. The combined company will operate as HUB Cyber Security Ltd., and the combined company's ordinary shares and two series of warrants have been approved for trading on Nasdaq under the ticker symbols "HUBC," "HUBCW, and "HUBCZ" respectively. HUB's move to the Nasdaq follows the company's delisting of its ordinary shares and warrants from the Tel Aviv Stock Exchange (TASE). As previously announced, Mount Rainier stockholders approved the transaction at a previously held special meeting.

To celebrate the completion of the business combination, HUB's leadership will be at the Nasdaq MarketSite to ring the opening bell on March 1, 2023.

"We are extremely pleased to complete this transaction and become a public company traded on the NASDAQ," says Uzi Moskovitch, Major General (Ret.), CEO of HUB. "HUB has grown rapidly, and we believe this transformative step will support our initiatives to capitalize on the large, and fast growing market for more efficient and effective cybersecurity solutions. Our goal is to continue to develop and implement advanced Confidential Computing and other cybersecurity technologies for our current and future customers in both government and private industries. Access to larger capital markets is expected to enable HUB to accelerate its growth plans both in technology development and customer adoption, while building more value for our public shareholders."

### Advisors

A-Labs Advisory & Finance Ltd. and Oppenheimer & Co. Inc. served as financial advisors to HUB. Latham & Watkins LLP served as legal advisor to HUB. A.G.P./Alliance Global Partners served as the exclusive financial advisor to RNER. Loeb & Loeb LLP and Sullivan & Worcester LLP (Tel Aviv) served as legal advisors to RNER.

### About HUB Cyber Security Ltd

HUB Cyber Security Ltd ("HUB") was established in 2017 by veterans of the 8200 and 81 elite intelligence units of the Israeli Defense Forces. The company specializes in unique Cyber Security solutions protecting sensitive commercial and government information. The company debuted an advanced encrypted computing solution aimed at preventing hostile intrusions at the hardware level while introducing a novel set of data theft prevention solutions. HUB operates in over 30 countries and provides innovative cybersecurity computing appliances as well as a wide range of cybersecurity services worldwide.

## About Mount Rainier Acquisition Corp.

Mount Rainier Acquisition Corp. is a blank check company sponsored by DC Rainier SPV LLC, a Delaware limited liability company managed by Dominion Capital LLC, whose business purpose is to effect a merger, share exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.

## Forward-Looking Statements

This press release contains forward-looking statements for purposes of the safe harbor provisions under the United States Private Securities Litigation Reform Act of 1995, including statements about the anticipated benefits of the transaction, and the financial condition, results of operations, earnings outlook and prospects of the combined company. Forward-looking statements are typically identified by words such as "plan," "believe," "expect," "anticipate," "intend," "outlook," "estimate," "future," "forecast," "project," "continue," "could," "may," "might," "possible," "potential," "predict," "seem," "should," "will," "would" and other similar words and expressions, but the absence of these words does not mean that a statement is not forward-looking.

The forward-looking statements are based on the current expectations of the management of HUB, as applicable, and are inherently subject to uncertainties and changes in circumstances and their potential effects and speak only as of the date of such statement. There can be no assurance that future developments will be those that have been anticipated. These forward-looking statements involve a number of risks, uncertainties or other assumptions that may cause actual results or performance to be materially different from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, those discussed and identified in public filings made with the SEC by the HUB and the following: (i) expectations regarding HUB's strategies and future financial performance, including its future business plans or objectives, prospective performance and opportunities and competitors, revenues, products and services, pricing, operating expenses, market trends, liquidity, cash flows and uses of cash, capital expenditures, and HUB's ability to invest in growth initiatives and pursue acquisition opportunities; (ii) the outcome of any legal proceedings that may be instituted against the combined company; (iii) the ability to meet stock exchange continued listing standards; (iv) the risk that the consummation of the business combination disrupts HUB's current operations and future plans; (v) the ability to recognize the anticipated benefits of the transaction, which may be affected by, among other things, competition, the ability of HUB to grow and manage growth profitably, maintain relationships with customers and suppliers and retain its management and key employees; (vi) costs related to the transaction; (vii) limited liquidity and trading of HUB's securities; (viii) geopolitical risk, including military action and related sanctions, and changes in applicable laws or regulations; (ix) the possibility that HUB may be adversely affected by other economic, business, and/or competitive factors; (x) inaccuracies for any reason in the estimates of expenses and profitability and projected financial information for HUB; and (xi) other risks and uncertainties set forth in the section entitled "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements" in HUB's final proxy statement/prospectus filed on December 5, 2022.

Should one or more of these risks or uncertainties materialize or should any of the assumptions made by the management of HUB prove incorrect, actual results may vary in material respects from those expressed or implied in these forward-looking statements.

All subsequent written and oral forward-looking statements concerning the business combination or other matters addressed in this press release and attributable to HUB or any person acting on their behalf are expressly qualified in their entirety by the cautionary statements contained or referred to in press release. Except to the extent required by applicable law or regulation, HUB undertakes no obligation to update these forward-looking statements to reflect events or circumstances after the date of this press release to reflect the occurrence of unanticipated events.

**Media contact**
Matt McLoughlin
Gregory FCA on behalf of HUB
Phone: 610.996.4264
matt@gregoryfca.com

**EXHIBIT B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------- X

OPPENHEIMER & CO. INC.,

                    Plaintiff,

     vs.

HUB CYBER SECURITY (ISRAEL) LTD.
a/k/a HUB CYBER SECURITY LTD.,

                    Defendant.

--------------------------------------------------------- X

**1:23-cv-04909-JPC**

**ANSWER**

Defendant HUB Cyber Security Ltd. ("HCSL"),[1] by and through its undersigned counsel, hereby answers the Complaint brought by Plaintiff Oppenheimer & Co. Inc. ("Oppenheimer") as follows:

## PRELIMINARY STATEMENT

1.     With respect to the allegations in the first sentence of Paragraph 1 of the Complaint, HCSL admits that Oppenheimer brought this action alleging that it is owed fees in excess of $12,000,000, and that Oppenheimer served as one of HCSL's financial advisors with respect to HCSL's February 28, 2023 business combination with Mount Rainier, but denies the allegation in the first sentence of Paragraph 1 that Oppenheimer is entitled to the fee it demands or any particular fee amount.[2]  HCSL admits that the parties entered into a written agreement that provides for a fee based on the results of the Transaction, but to the extent not so admitted denies the allegations in the second sentence of Paragraph 1 and refers the Court to the referenced agreement, which is the letter agreement, dated December 24, 2021 (the "Agreement"), attached as Exhibit A to the

---

[1] As of January 18, 2023, Hub Cyber Security (Israel) Ltd. changed its legal name to HUB Cyber Security Ltd.

[2] Capitalized terms not defined herein have the same meanings as in the Complaint. Dkt. 1.

Complaint, for the terms thereof. With respect to the allegations in the third sentence of Paragraph 1, HCSL admits that due to the urgency of the matter and pressure to consummate the Transaction HCSL and Oppenheimer discussed the payment of a fee but denies that HUB requested a significant reduction and specifically denies that it acknowledged that Oppenheimer was due a fee of over $12,000,000 with regard to the anticipated transaction. Oppenheimer's allegation in the fourth sentence of Paragraph 1 that it had no obligation to agree to reduce its fees is a legal conclusion to which no response is required. With respect to the remaining allegations in the fourth sentence of Paragraph 1, HCSL admits that due to the urgency of the matter and pressure to consummate the Transaction the parties executed an amended agreement purporting to set forth a revised fee and payment terms but denies that Oppenheimer is entitled to such fee. HCSL admits the allegation in the fifth sentence of Paragraph 1 that the amended agreement reserved the right to seek fees purportedly owed under the original Agreement. HCSL admits that it has not paid Oppenheimer any money but denies that Oppenheimer is entitled to the fees it demands and denies the remaining allegations in the sixth sentence of Paragraph 1, including to the extent the allegations state a legal conclusion to which no response is required. HCSL denies the allegations in the seventh sentence of Paragraph 1.

## **PARTIES**

2.      HCSL lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 2.

3.      HCSL admits the allegations in Paragraph 3.

4.      HCSL admits the allegations in Paragraph 4 as to itself and that the amount in controversy is in excess of $75,000, and as to the remaining allegations in Paragraph 4 does not respond to the extent the allegations state a legal conclusion to which no response is required.

4867-8320-3711

HCSL lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 4 as to Oppenheimer.

     5.       HCSL admits the allegations in Paragraph 5.

     6.       HCSL admits the allegations in Paragraph 6.

     7.       HCSL admits the allegations in Paragraph 7.

## BACKGROUND

### The Agreement

     8.       HCSL admits that Oppenheimer is an investment bank that provides investment banking advice and services, but to the extent not so admitted lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 8.

     9.       HCSL admits the allegations in Paragraph 9.

     10.     HCSL admits the allegations in Paragraph 10 that in or about December 2021, HCSL or someone on HCSL's behalf approached Oppenheimer with respect to a possible SPAC transaction, and states that Oppenheimer served as one of HCSL's financial advisors with respect to the Transaction.

     11.     HCSL admits that on December 24, 2021, the parties entered into a written agreement regarding Oppenheimer's provision of financial advice and assistance in connection with the Transaction, including but not limited to investment banking services, as well as the fees and reimbursements to which Oppenheimer would be entitled in exchange for its financial advice and assistance, but to the extent not so admitted denies the allegations in the first sentence of Paragraph 11, and refers the Court to the Agreement for the full statement of its terms and conditions. HCSL admits the allegations in the second sentence of Paragraph 11. HCSL admits the allegation in the third sentence of Paragraph 11 that a true and correct copy of the Agreement

3

is annexed to the Complaint as Exhibit A.

    12.    HCSL admits the allegation in Paragraph 12.

    13.    HCSL admits the allegation in Paragraph 13.

    14.    HCSL admits the allegations in Paragraph 14.

    15.    HCSL admits the allegations in Paragraph 15, including footnote 1.

    16.    HCSL admits the allegation in Paragraph 16.

    17.    HCSL admits the allegations in Paragraph 17.

    18.    HCSL denies the allegation in Paragraph 18 that the Agreement entitles Oppenheimer to recover its costs associated with any breach of the Agreement by HCSL, and refers the Court to the Agreement for the full statement of its terms and conditions.

    19.    HCSL denies the allegations in Paragraph 19.

    20.    HCSL admits that Mount Rainier entered into an agreement with HCSL with regard to the combination of the entities but to the extent not so admitted denies the allegations in the first sentence of Paragraph 20.  HCSL admits the allegation in the second sentence of Paragraph 20.

    21.    HCSL admits the allegations in Paragraph 21.

    22.    HCSL admits the allegation in Paragraph 22.

    23.    HCSL admits the allegations in Paragraph 23.

**The Amended Agreement**

    24.    HCSL admits that prior to the closing of the Transaction the parties discussed the fees described in the Agreement but denies the allegations in Paragraph 24 to the extent that they imply that Oppenheimer is entitled to fees and reimbursements in the amount of $12,062,751.14 or any other particular fee or reimbursement amount.

    25.    With respect to the allegation in subclause (i) of the first sentence of Paragraph 25,

4867-8320-3711

HCSL admits that Oppenheimer served as one of HCSL's financial advisors with respect to the Transaction, but denies the allegation to the extent it implies that Oppenheimer performed its services diligently and fully, or satisfied its performance obligations under the Agreement. With respect to the allegation in subclause (ii) of the first sentence of Paragraph 25, HCSL admits that Oppenheimer served as one of HCSL's financial advisors with respect to the Transaction, but denies the allegation to the extent it implies that Oppenheimer was entitled to fees and reimbursements in the amount of $12,062,751.14. HCSL denies the allegation in the second sentence of Paragraph 25 that Oppenheimer fully performed its obligations under the Agreement. With respect to the allegations in the second sentence of Paragraph 25, HCSL admits that due to the urgency of the matter and pressure to consummate the Transaction the parties discussed the payment of a fee over an extended period but denies that HUB requested a significant discount, and denies the allegations in the second sentence of Paragraph 25 to the extent that they imply that Oppenheimer is entitled to fees and reimbursements in the amount of $12,062,751.14 or any other particular fee or reimbursement amount.

26. Oppenheimer's allegation in Paragraph 26 that it had no obligation to agree to reduce its fees is a legal conclusion to which no response is required. With respect to the remaining allegations in Paragraph 26, HCSL admits that due to the urgency of the matter and pressure to consummate the Transaction the parties discussed Oppenheimer's fees and memorialized an agreement in a document dated February 27, 2023, but denies the allegations in Paragraph 26 to the extent that they imply that Oppenheimer is entitled to any particular fee or reimbursement amount.

27. With respect to the allegation in Paragraph 27, HCSL admits that, to avoid Oppenheimer seeking to delay or otherwise negatively impact the Transaction, due to the urgency

4867-8320-3711

of the matter and pressure to consummate the Transaction, Uzi Moskowitz executed the Amended Agreement, but denies the allegation in Paragraph 27 to the extent that it implies that Oppenheimer is entitled to a any particular fee or reimbursement amount.

28. HCSL admits the allegation in Paragraph 28.

29. HCSL admits the allegation in Paragraph 29.

**HCSL's Breach of the Agreement and the Amended Agreement**

30. HCSL admits the allegations in Paragraph 30.

31. HCSL admits the allegations in Paragraph 31.

32. HCSL admits that the Amended Agreement provides for an installment payment upon closing of the Transaction, but to the extent not so admitted denies the allegations in Paragraph 32.

33. HCSL admits that it did not pay Oppenheimer any amount of money on February 28, 2023, but to the extent not so admitted denies the allegation in Paragraph 33.

34. HCSL admits that several officers met with Oppenheimer in New York on March 1, 2023, and conveyed to Oppenheimer that HCSL would be able to pay Oppenheimer some amount only if HCSL could generate liquidity based on the value of HCSL stock following the Transaction. To the extent not so admitted, HCSL denies the allegations in Paragraph 34.

35. HCSL admits the allegations in Paragraph 35.

36. HCSL admits that it has not paid any amount of money to Oppenheimer but denies that it has not disputed that Oppenheimer is entitled to the fees and reimbursements it is seeking. HCSL further denies the allegations in Paragraph 36 to the extent they imply that HCSL agreed that Oppenheimer is entitled to fees and reimbursements in the amount of $12,062,751.14 or any other particular fee or reimbursement amount.

4867-8320-3711

37.     HCSL admits that it has not paid any amount of money to Oppenheimer as of the date of the Complaint, but otherwise denies the allegations in the first sentence of Paragraph 37 and refers the Court to the Agreement for the full statement of its terms and conditions.  The second sentence of Paragraph 37 does not state factual allegations to which a response is required, however, HCSL avers that Oppenheimer is not entitled to recover the damages claimed.  The third sentence of Paragraph 37 does not state factual allegations to which a response is required, however, HCSL avers that Oppenheimer is not entitled to the relief demanded in the Complaint.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Breach of Contract)

38.     In response to Paragraph 38, HCSL incorporates by reference all of its preceding responses to Oppenheimer's allegations as fully set forth herein.

39.     HCSL admits the allegations in Paragraph 39 that Oppenheimer served as one of HCSL's financial advisors with respect to the Transaction.  HCSL denies the allegations in Paragraph 39 to the extent that they imply that Oppenheimer has fully performed its obligations under the Agreement.

40.     Paragraph 40 states a legal conclusion to which no response is required.

41.     HCSL denies the allegation in Paragraph 41.

42.     HCSL denies the allegations in Paragraph 42.

43.     HCSL denies the allegations in Paragraph 43.

### SECOND CAUSE OF ACTION
### (Breach Of The Implied Covenant Of Good Faith And Fair Dealing)

44.     In response to Paragraph 44, HCSL incorporates by reference all of its preceding responses to Oppenheimer's allegations as fully set forth herein.

45.     Paragraph 45 states a legal conclusion to which no response is required.

4867-8320-3711

46.     HCSL denies the allegations in Paragraph 46.

47.     HCSL denies the allegations in Paragraph 47.

### THIRD CAUSE OF ACTION
### (Quantum Meruit)

48.     In response to Paragraph 48, HCSL incorporates by reference all of its preceding responses to Oppenheimer's allegations as fully set forth herein.

49.     HCSL admits the allegation in Paragraph 49 that Oppenheimer served as one of HCSL's financial advisors with respect to the Transaction and avers that the provision of Oppenheimer's investment banking advice and services to HCSL was at the request of HCSL or someone on HCSL's behalf.

50.     HCSL admits that Oppenheimer served as one of HCSL's financial advisors with respect to the Transaction, but otherwise denies the allegations in Paragraph 50, including to the extent they imply that Oppenheimer satisfied its performance obligations under the Agreement.

51.     HCSL admits that its press release disclosed that Oppenheimer served as one of HCSL's financial advisors with respect to the Transaction, but denies the allegations in Paragraph 51 to the extent that they imply that Oppenheimer satisfied its performance obligations under the Agreement.

52.     HCSL lacks sufficient knowledge and information to form a belief as to truth or falsity of the allegations in Paragraph 52.

53.     HCSL denies the allegations in Paragraph 53.

### AFFIRMATIVE AND OTHER DEFENSES

54.     HCSL will rely upon the following affirmative and additional defenses, which do not constitute an admission of liability or an assumption of the burden of proof.  HCSL reserves the right to amend its Answer to add additional affirmative and/or special defenses or to delete or

withdraw affirmative defenses as warranted in the event that discovery or further investigation indicates that such would be appropriate.

## FIRST DEFENSE

55. Oppenheimer's claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and quantum meruit are barred in whole or in part because the Complaint fails to state a claim upon which relief may be granted.

## SECOND DEFENSE

56. Oppenheimer's claims are barred in whole or in part because Oppenheimer has failed to satisfy its performance obligations under the Agreement.

## THIRD DEFENSE

57. HCSL acted reasonably and in good faith under the circumstances.

## FOURTH DEFENSE

58. Oppenheimer cannot show that the reasonable value of the services provided by Oppenheimer is $12,062,751.14 plus 1% of the principal amount of any debt or other liabilities of HCSL as of the closing date of the Transaction.

## FIFTH DEFENSE

59. Oppenheimer is not entitled to relief to the extent that HCSL's failure to pay was caused in whole or in part by Oppenheimer's failure to satisfy its performance obligations.

## PRAYER FOR RELIEF

With respect to Oppenheimer's Prayer for Relief, HCSL denies that Oppenheimer is entitled to the relief demanded therein.

9

Dated:     New York, New York
September 22, 2023

                    PILLSBURY WINTHROP SHAW PITTMAN LLP

                    By:  */s/ Ari M. Berman*
                          Ari M. Berman
                          Eugenie H. Dubin
                          31 West 52nd Street
                          New York, New York 10019
                          Phone: (212) 858-1000
                          Fax: (212) 858-1500
                          ari.berman@pillsburylaw.com
                          eugenie.dubin@pillsburylaw.com

                    *Counsel for Defendant*

10